UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

            Plaintiff,                         CRIMINAL NO. 03-80406

v.                                             HON. GERALD E. ROSEN

D-2 IMAD MOHAMAD-MUSBAH HAMMOUD,               VIO.  18 U.S.C. § 1962(d)
        a/k/a "Jecob Hammoud,"                       18 U.S.C. § 545
        a/k/a "Jacob Hammoud,"
        a/k/a "Haj Imad,"
        a/k/a "Tony,"
D-3 HASSAN ALI AL-MOSAWI,
        a/k/a "Hassan Al-Moussaoui,"
        a/k/a "Abu Kifah,"
D-4 HASSAN HASSAN NASSER,
D-5 KARIM HASSAN NASSER,
D-6 ALI AHMAD HAMMOUD,
        a/k/a "Abu Hussein,"
D-7 FADI MOHAMAD-MUSBAH HAMMOUD,
        a/k/a "Fadi Musbah Hammoud,"
D-8 MAJID MOHAMAD HAMMOUD,
        a/k/a "Mike Hammoud,"
D-9 JIHAD HAMMOUD,
        a/k/a "Jay Hammoud,"
D-10 KARIM HASSAN ABBAS,
D-11 YOUSSEF AOUN BAKRI,
D-12 HASSAN MOHAMAD SROUR,
D-13 NAJI HASSAN ALAWIE,
D-14 ALI NAJIB BERJAOUI,
D-15 MOHAMAD ZEIDAN,
D-16 ABDEL-HAMID SINNO,
        a/k/a "Haj Abdullah,"
D-17 THEODORE SCHENK,
D-18 IMAD MAJED HAMADEH, and
D-19 ADEL ISAK,

            Defendants.
                                            /

## FIRST SUPERSEDING INDICTMENT

THE GRAND JURY CHARGES:

### GENERAL ALLEGATIONS

1. States have the concurrent authority and jurisdiction to enact and enforce cigarette tax laws, to provide for the confiscation of cigarettes and other property seized for violations of such laws, and for the administration of such laws, including the imposition of cigarette tax rates.

2. Some states, in order to evidence the payment of applicable state cigarette taxes in the state where such cigarettes are found, require a stamp, impression, or other indication to be placed on packages or other containers of cigarettes.

3. Beginning on May 1, 1994, the State of Michigan raised its cigarette tax from $2.50 per carton to $ 7.50 per carton (75 ¢ per pack) of cigarettes. This tax rate continued until July 31, 2002.

4. On August 1, 2002, and continuing thereafter to the date of this indictment, the State of Michigan again raised its cigarette tax from $7.50 per carton to $12.50 per carton.

5. Beginning on June 1, 1993, the State of New York raised its cigarette tax from $3.90 per carton to $5.60 per carton (56¢ per pack). This tax rate continued until February 29, 2000.

6. On March 1, 2000, the State of New York again raised its cigarette tax from $5.60 per carton to $11.10 per carton. This tax rate continued until April 2, 2002.

7. On April 3, 2002, and continuing thereafter to the date of this indictment, the State of New York raised its cigarette tax from $11.10 per carton to $15.00 per carton.

8. In addition to the State of New York cigarette tax, during all times material to this indictment, New York City imposed a cigarette tax of 80¢ per carton.

9. During all times material to this indictment, the State of North Carolina had a cigarette tax of only 50¢ per carton.

10. During all times material to this indictment, the Cattaraugus Indian Reservation, owned by the Seneca Indian Tribe in New York, had no tax on the sale of cigarettes to members of the tribe.

11. Beginning on May 1, 1998, in order to address the significant problem of untaxed or low-taxed cigarettes being smuggled into the state, the Legislature of the State of Michigan enacted a requirement that each pack of cigarettes sold in the state have a tax stamp evidencing payment of cigarette taxes.

12. During all times material to this indictment, the State of New York required that each pack of cigarettes sold in the state have a tax stamp evidencing payment of cigarette taxes.

3

13. During all times material to this indictment, Pfizer was an internationally known producer of prescription drugs and the proprietary maker of the prescription drug Viagra. Pfizer holds the patents on Sildenafil Citrate (the active ingredient in Viagra), the process and preparation of Viagra, the tablet design shape of Viagra, and the tablet design shape plus color of Viagra. In short, at all material times, Pfizer was the only legal producer of Viagra, which Pfizer makes at plants in France and Puerto Rico, among others. Pfizer has never produced Viagra in the State of Florida, in India, or in China.

14. At all times material to this indictment, Bollore, Inc. was an internationally known distributor of specialty paper products, and has for over a century used the "Zig-Zag" trademark and the depiction of a bearded man (the "Smoking Man Design") trademark (collectively, the "Zig-Zag Trademarks") in connection with its cigarette paper products, cartons, cases and booklets. Both the Zig Zag and Smoking Man Design trademarks are registered with the United States Patent and Trademark Office.

15. At all times material to this indictment, Bollore owned the trademark registrations for the Zig Zag Trademarks in the United States and in various countries throughout the world, and has granted an exclusive license to North Atlantic Operating Company, Inc. in the United States for the importation and distribution of

4

Zig Zag cigarette paper products. None of the defendants named herein were licensed to distribute Zig Zag cigarette paper products.

16. Pursuant to the Anti-Terrorism and Effective Death Penalty Act, the United States Secretary of State is empowered to designate groups as "foreign terrorist organizations." 8 U.S.C. § 1189(a)(1). An entity may be designated as a foreign terrorist organization if the Secretary finds that: (1) the organization is a foreign organization; (2) the organization engages in terrorist activity; and (3) the terrorist activity of the organization threatens the security of United States nationals or the national security of the United States. Effective October 8, 1997, the Secretary of State designated as a foreign terrorist organization Hizballah, also known as "Party of God," also known as "Islamic Jihad," also known as "Islamic Jihad Organization," also known as "Revolutionary Justice Organization," also known as "Organization of the Oppressed on Earth," also known as "Islamic Jihad for the Liberation of Palestine," also known as "Organization of Right Against Wrong," also known as "Ansar Allah," also known as "Followers of the Prophet Muhammad."

17. Hizballah is a world-wide terrorist network which serves as an organization that advocates for the empowerment of Shiite Muslims. Hizballah supports the model of the Iranian Islamic Republic and promotes the realization of this form of government worldwide. Its ideological basis derives from the Islamic fundamental-

ism expressed by the Ayatollah Khomeini of Iran.  Hizballah's goals include the eradication of "western imperialism" from the Middle East represented in part by the United States ("the Great Satan") and Israel ("the little Satan").

## COUNT ONE

### ( Conspiracy to Violate the Racketeer Influenced and Corrupt Organizations Act (RICO) – 18 U.S.C. § 1962(d))

D-2 IMAD MOHAMAD-MUSBAH HAMMOUD,
 a/k/a "Jecob Hammoud,"
 a/k/a "Jacob Hammoud,"
 a/k/a "Haj Imad,"
 a/k/a "Tony,"
D-3 HASSAN ALI AL-MOSAWI,
 a/k/a "Hassan Al-Moussaoui,"
 a/k/a "Abu Kifah,"
D-4 HASSAN HASSAN NASSER,
D-5 KARIM HASSAN NASSER,
D-6 ALI AHMAD HAMMOUD,
 a/k/a "Abu Hussein,"
D-7 FADI MOHAMAD-MUSBAH HAMMOUD,
 a/k/a "Fadi Musbah Hammoud,"
D-8 MAJID MOHAMAD HAMMOUD,
 a/k/a "Mike Hammoud,"
D-9 JIHAD HAMMOUD,
 a/k/a "Jay Hammoud,"
D-10 KARIM HASSAN ABBAS,
D-11 YOUSSEF AOUN BAKRI,
D-12 HASSAN MOHAMAD SROUR,
D-13 NAJI HASSAN ALAWIE,
D-14 ALI NAJIB BERJAOUI,
D-15 MOHAMAD ZEIDAN,
D-16 ABDEL-HAMID SINNO,
 a/k/a "Haj Abdullah,"
D-17 THEODORE SCHENK,
D-18 IMAD MAJED HAMADEH, and
D-19 ADEL ISAK,

## THE HAMMOUD ENTERPRISE

1.   The general allegations are hereby repeated and incorporated herein by reference.

2.   From approximately May 1996 through the date of this Indictment, in the Eastern District of Michigan and elsewhere, IMAD MOHAMAD-MUSBAH HAMMOUD, also known as "Jecob Hammoud," also known as "Jacob Hammoud," also known as "Haj Imad," also known as "Tony," HASSAN ALI AL-MOSAWI, also known as "Hassan Al-Moussaoui," also known as "Abu Kifah," HASSAN HASSAN NASSER, KARIM HASSAN NASSER, ALI AHMAD HAMMOUD, also known as "Abu Hussein," FADI MOHAMAD-MUSBAH HAMMOUD, also known as "Fadi Musbah Hammoud," MAJID MOHAMAD HAMMOUD, also known as "Mike Hammoud," JIHAD HAMMOUD, also known as "Jay Hammoud," KARIM HASSAN ABBAS, YOUSSEF AOUN BAKRI, HASSAN MOHAMAD SROUR, NAJI HASSAN ALAWIE, ALI NAJIB BERJAOUI, MOHAMAD ZEIDAN, IMAD MAJED HAMADEH, and ADEL ISAK, defendants herein, Hassan Makki and Fadi Haydous, not named as defendants herein, and others both known and unknown to the Grand Jury, were associated in fact and constituted an enterprise, as defined in Title 18, United States Code, Section 1961(4), which was engaged in, and the activities of which, affected interstate and foreign commerce, and which enterprise

8

constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise.

3. The enterprise operated from Lebanon, Canada, Brazil, Paraguay, China, North Carolina, Florida and the Dearborn, Michigan area, perpetrating crimes in the States of Michigan, California, Florida, Georgia, Illinois, Kentucky, Missouri, New York, North Carolina and West Virginia (and points in between). The criminal enterprise was bound together by a common heritage (Lebanese); a common language (Arabic); allegiance to and support of Hizballah; blood relations; and a common purpose of generating large sums of cash illegally.

4. The enterprise was structured in the following manner, and the defendants and other persons employed by and associated with the enterprise functioned in the following roles:

A. IMAD HAMMOUD, defendant herein, was a central conduit of virtually every aspect of the enterprise's unlawful activities. IMAD HAMMOUD and his partner, Hassan Makki, not named as a defendant herein, ran a multi-million dollar a year contraband cigarette trafficking organization headquartered in the Dearborn, Michigan area between 1996 and 2002. The contraband cigarettes were supplied by Haissam Nashar and Mohamad Hammoud, not named as defendants herein, in North Carolina;

9

Donald Mikesell, not named as a defendant herein, in Kentucky; and several individuals on the Cattaraugus Indian Reservation near Irving, New York. The enterprise employed drivers and couriers, including HASSAN NASSER, KARIM NASSER, KARIM ABBAS, NAJI ALAWIE, and YOUSSEF BAKRI, defendants herein, to transport money and cigarettes between North Carolina, Kentucky, New York and Michigan. Quantities worth up to $500,000 per week of low-taxed and untaxed cigarettes were transported by the above-named couriers and others in recreational vehicles, vans, and trucks from North Carolina, Kentucky, and the Cattaraugus reservation to Michigan and New York.

B. The transactions were virtually always paid for in cash on delivery, or shortly thereafter. Hassan Makki, not named as a defendant herein, HASSAN NASSER, KARIM NASSER, KARIM ABBAS, NAJI ALAWIE, defendants herein, and others would deliver large amounts of cash to North Carolina, Kentucky and the Cattaraugus Indian Reservation in payment for the contraband cigarettes. JIHAD HAMMOUD, defendant herein, gathered, held, and transferred some of the large amounts of cash needed to finance the contraband cigarette transactions and other schemes perpetrated by the enterprise.

C. IMAD HAMMOUD, MAJID HAMMOUD, FADI HAMMOUD, ALI HAMMOUD, HASSAN NASSER, YOUSSEF BAKRI, ALI BERJAOUI and ADEL ISAK, defendants herein, and Hassan Makki and Fadi Haydous, not named as defendants herein, and others both known and unknown to the Grand Jury, would then re-distribute the cigarettes within the States of Michigan and New York (including New York City), providing substantial cash profits to the enterprise. IMAD HAMMOUD maintained warehouses in Taylor, Michigan and Dearborn, Michigan, placed in someone else's name, to facilitate the massive distribution of contraband cigarettes. FADI HAMMOUD ran a tobacco shop in New Baltimore, Michigan to further facilitate the enterprise's distribution system, which shop was placed in someone else's name after he was caught by authorities with contraband cigarettes.

D. When Michigan enacted its tax stamp requirement in 1998, IMAD HAMMOUD worked together with HASSAN NASSER, KARIM NASSER, HASSAN SROUR, JIHAD HAMMOUD, NAJI ALAWIE, ALI HAMMOUD, defendants herein, Hassan Makki, Fadi Haydous, and Haissam Nashar, not named as defendants herein, and others known and unknown to the Grand Jury, to obtain, produce and/or distribute millions of

11

counterfeit state cigarette tax stamps for the States of Michigan, California, Illinois and New York. Members and associates of the enterprise then arranged for (1) counterfeit tax stamps to be placed on packs of cigarettes in Michigan and elsewhere; (2) counterfeit tax stamps to be trafficked to other states; and (3) contraband cigarettes containing counterfeit tax stamps to be sold in Michigan and elsewhere, producing substantial profits for the enterprise. NAJI ALAWIE, defendant herein, maintained a house in Algonac, Michigan where counterfeit tax stamps were applied to contraband cigarettes for resale within the State of Michigan. With the assistance of ADEL ISAK, defendant herein, and others, the enterprise also procured legitimate cigarette tax stamps which members and associates of the enterprise applied to contraband cigarettes for resale within the State of Michigan.

E. After Michigan imposed a cigarette tax stamp, the criminal enterprise expanded its avenues for making illegal profits. The enterprise sought to obtain and traffic in counterfeit and stolen goods.

With respect to goods bearing counterfeit marks, HASSAN AL-MOSAWI and IMAD HAMMOUD, defendants herein, worked together with ABDEL-HAMID SINNO, and IMAD HAMADEH, defendants herein,

and others both known and unknown to the Grand Jury to obtain and distribute counterfeit versions of the prescription drug Viagra. HASSAN AL-MOSAWI and IMAD HAMMOUD arranged for shipments of counterfeit Viagra to be made from the Middle East, China, and Europe to the United States. AL-MOSAWI and HAMMOUD also procured counterfeit Viagra from Florida through THEODORE SCHENK, defendant herein, with the assistance of ABDEL-HAMID SINNO, and IMAD HAMADEH. Moreover, HAMADEH, IMAD HAMMOUD, and others both known and unknown to the Grand Jury collaborated on the procurement and distribution of counterfeit Zig Zag cigarette paper products.

With respect to possessing, transporting, and trafficking in stolen goods and attempts to do so, IMAD HAMMOUD, with the assistance of MOHAMAD ZEIDAN and others, both known and unknown to the Grand Jury, purchased and transported in interstate commerce thousands of cartons of stolen R.J. Reynolds cigarettes from Kentucky. HAMMOUD and IMAD HAMADEH also worked together, and with others both known and unknown to the Grand Jury, to procure thousands of dollars worth of socks, toilet paper, and Similac infant formula which they believed to have been stolen from interstate commerce.

F. Throughout the conspiracy, HASSAN AL-MOSAWI, IMAD HAMMOUD, HASSAN NASSER, KARIM NASSER, ALI HAMMOUD, defendants herein, and Hassan Makki, not named as a defendant herein, were avid supporters of the foreign terrorist organization Hizballah. These defendants referred to Hizballah by the Arabic phrase, Al-Moukawama, meaning "the Resistance." The conspirators called the General Secretary of Hizballah, Hassan Nasrallah, by the title of Al-Sayed, meaning "the Master" in Arabic. Persons critical of Hizballah were confronted and expelled from the conspiracy. Portions of the profits made from the illegal enterprise were given to Hizballah. The conspirators vocally contended for Hizballah, celebrated Hizballah operations, solicited money from customers and associates for Hizballah, and personally raised or gave money to Hizballah. IMAD HAMMOUD, defendant herein, and Hassan Makki, not named as a defendant herein, for example, charged a "Resistance Tax," being a set amount over black market price per carton of contraband cigarettes, which their customers were told would be going to Hizballah. IMAD HAMMOUD, defendant herein, and Hassan Makki, not named as a defendant herein, also maintained literal and figurative containers where Hizballah donations would be set aside for transfer to Lebanon. IMAD

14

HAMMOUD, HASSAN NASSER, defendants herein, and Hassan Makki, not named as a defendant herein, also directly solicited others to contribute money to the orphans of martyrs program run by Hizballah in Southern Lebanon to support the families of persons killed in Hizballah suicide and other terrorist operations. Some of the Hizballah monies were sent to Lebanon via HASSAN AL-MOSAWI, who had a close personal relationship with upper echelon Hizballah officials. AL-MOSAWI's participation with the conspiracy was expressly for the purpose of benefitting Hizballah; and virtually all of the conspirators' collaboration with AL-MOSAWI was to garner favor from Hizballah. ALI HAMMOUD, defendant herein, and others, also body-carried money to Lebanon for Hizballah on behalf of the conspiracy.

## THE RACKETEERING CONSPIRACY

5. From approximately in or about May 1996, and continuing thereafter through the date of this indictment, the exact dates being unknown, in the Eastern District of Michigan and elsewhere, IMAD MOHAMAD-MUSBAH HAMMOUD, a/k/a "Jecob Hammoud," a/k/a "Jacob Hammoud," a/k/a "Haj Imad," a/k/a "Tony," HASSAN AL-MOSAWI, a/k/a "Hassan Al-Moussaoui," a/k/a "Abu Kifah," HASSAN HASSAN NASSER, KARIM HASSAN NASSER, ALI AHMAD HAMMOUD, a/k/a "Abu

15

Hussein," FADI MOHAMAD-MUSBAH HAMMOUD, a/k/a "Fadi Musbah Hammoud," MAJID MOHAMAD HAMMOUD, a/k/a "Mike Hammoud," JIHAD HAMMOUD, a/k/a "Jay Hammoud," KARIM HASSAN ABBAS, YOUSSEF AOUN BAKRI, HASSAN MOHAMAD SROUR, NAJI HASSAN ALAWIE, ALI NAJIB BERJAOUI, MOHAMAD ZEIDAN, ABDEL-HAMID SINNO, also known as "Haj Abdullah," THEODORE SCHENK, IMAD MAJED HAMADEH, and ADEL ISAK, defendants herein, Hassan Makki and Fadi Haydous, not named as defendants herein, and others both known and unknown to the Grand Jury, being persons employed by and associated with the enterprise described above, which enterprise was engaged in, and the activities of which affected interstate and foreign commerce, did unlawfully and knowingly, conspire, confederate, and agree with each other and with persons known and unknown to the Grand Jury, to commit an offense against the United States, to wit: to violate Title 18, United States Code, Section 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise, through a pattern of racketeering activity as that term is defined by Title 18, United States Code, Sections 1961(1) and (5), to wit, multiple acts as set forth below:

 A. Acts indictable under Title 18, United States Code, Section 2342 (relating to contraband cigarette trafficking);

B. Acts indictable under Title 18, United States Code, Section 2315 (relating to the possession of counterfeit state cigarette tax stamps);

C. Acts indictable under Title 18, United States Code, Section 2320 (relating to trafficking in goods bearing counterfeit marks);

D. Acts indictable under Title 18, United States Code, Sections 2314 and 2315 (relating to the interstate transportation and possession of stolen property); and

E. Acts indictable under Title 18, United States Code, Section 1956 (relating to money laundering).

## MANNER AND MEANS OF THE CONSPIRACY

6. It was a part of the conspiracy that the defendants and their co-conspirators, would and did commit acts indictable under Title 18, United States Code, Section 2342, in connection with efforts to procure low-taxed cigarettes North Carolina, Kentucky and the Cattaraugus Indian Reservation and smuggle them into Michigan and New York for purposes of evading Michigan and New York state and municipal cigarette taxes in order to obtain large profits by reselling the cigarettes at market prices in Michigan and New York.

7. It was further a part of the conspiracy that the defendants and their co-conspirators would and did commit acts indictable under Title 18, United States

Code, Section 2315, in connection with efforts to obtain and produce counterfeit cigarette tax stamps. The criminal enterprise would affix the counterfeit tax stamps to the cigarettes to make it appear the tax had been paid and/or would sell the counterfeit stamps to others.

8.    It was further a part of the conspiracy that the defendants and their co-conspirators would and did commit acts indictable under Title 18, United States Code, Section 2320 in connection with procuring and trafficking goods with counterfeit marks, and attempting to do so, including counterfeit versions of the prescription drug Viagra and counterfeit Zig Zag cigarette paper products.

9.    It was further a part of the conspiracy that the defendants and their co-conspirators would and did commit acts indictable under Title 18, United States Code, Sections 2314 and 2315 in connection with possessing, transporting, and trafficking in stolen goods in interstate commerce including stolen cigarettes, and what they believed to be stolen socks, stolen toilet paper, and stolen Similac infant formula.

10.  It was further a part of the conspiracy that the defendants and their co-conspirators would and did commit acts indictable under Title 18, United States Code, Section 1956, in connection with the conducting of financial transactions, which would constitute money laundering. Cigarette trafficking was an extremely

18

profitable undertaking which involved hundreds of thousands of dollars in cash changing hands over relatively short periods of time. The cash garnered from these unlawful activities would then be laundered by members of the criminal enterprise by buying additional cigarettes; obtaining counterfeit cigarette tax stamps; purchasing counterfeit Viagra and Zig Zag cigarette paper products; purchasing and attempting to purchase stolen goods; wire transferring or body carrying money to Lebanon and other foreign countries; satisfying antecedent debts caused by their unlawful activities; paying money to various persons with the intent and expectation of continued illegal dealings; or otherwise to promote the enterprise.

11. It was further a part of the conspiracy that the defendants each agreed that two or more acts of racketeering activity would be committed in the conduct of the affairs of the enterprise.

## OVERT ACTS

In furtherance of the conspiracy, and to effect the objects thereof, the defendants and their co-conspirators committed and caused to be committed the following overt acts, among others, in the Eastern District of Michigan and elsewhere:

1. On or about January 25 and 26, 1996, IMAD HAMMOUD sent Jamal Ghoneim from Michigan to North Carolina with about $30,000 in cash to purchase approximately 3,810 cartons of contraband cigarettes for transportation to Michigan.

2. On or about March 14, 1996, MAJID HAMMOUD incorporated The Tobacco Stop, Inc. in Southgate, Michigan.

3. On or about May 9, 1996, FADI HAMMOUD incorporated King of Cigarettes, Inc., a tobacco shop in New Baltimore, Michigan; he changed the name to Smoker's City, Inc. on May 20, 1996.

4. On or about May 12, 1996, Hassan Makki and HASSAN NASSER possessed 2,400 cartons of contraband cigarettes in West Virginia.

5. On or about August 27, 1996, HASSAN NASSER possessed a list of cigarette orders and $12,500 in cash in West Virginia on the way to purchase contraband cigarettes in North Carolina.

6. On or about October 16, 1996, MAJID HAMMOUD incorporated Popeye Smokers, Inc. in Monroe, Michigan.

7. On or about January 14, 1997, NAJI ALAWIE possessed 8,311 cartons of contraband cigarettes in Kentucky.

8. On or about July 1, 1997, MAJID HAMMOUD issued a check to IMAD HAMMOUD in the amount of $39,656.

9. On or about September 23, 1997, JIHAD HAMMOUD, using the name "Jay Hammoud," incorporated Arco Oil Company, Inc. (a/k/a Huron Gas & Mart) located in Ypsilanti, Michigan.

10. On or about September 29, 1997, MAJID HAMMOUD deposited into his Huntington National Bank account a check in the amount of $6,000 made payable to KARIM ABBAS.

11. On or about November 7, 1997, FADI HAMMOUD and ALI HAMMOUD possessed 2,443 cartons of contraband cigarettes in Dearborn, Michigan.

12. On or about November 20, 1997, FADI HAMMOUD re-incorporated Smoker's City, Inc., a tobacco shop in New Baltimore, Michigan, as NB Smoker's City, Inc. and placed it in someone else's name.

13. On or about February 25, 1998, Gordon Michael Ryon possessed 16,078 cartons of contraband cigarettes on their way from North Carolina to IMAD HAMMOUD and his co-conspirators in Michigan.

14. On or about March 18, 1998, IMAD HAMMOUD caused the transportation of 40,000 pounds of contraband cigarettes, mislabeled as "clothing," from Charlotte, North Carolina, to a warehouse in Taylor, Michigan, leased under the business name "Nour Textiles."

15. On or about March 23, 1998, IMAD HAMMOUD caused the transportation of 10,000 pounds of contraband cigarettes, mislabeled as "shoes," from Charlotte, North Carolina, to a warehouse in Taylor, Michigan, leased under the business name "Nour Textiles."

16. On or about March 28, 1998, IMAD HAMMOUD caused the transportation of 20,000 pounds of contraband cigarettes, mislabeled as "clothing," from Charlotte, North Carolina, to a warehouse in Taylor, Michigan, leased under the business name "Nour Textiles."

17. On or about April 2, 1998, IMAD HAMMOUD caused the transportation of 28,000 pounds of contraband cigarettes, mislabeled as "shoes," from Charlotte, North Carolina, to a warehouse in Taylor, Michigan, leased under the business name "Nour Textiles."

18. On or about April 6, 1998, IMAD HAMMOUD caused the distribution of approximately 4,075 cartons of contraband cigarettes to Jeffrey Hider in Dearborn, Michigan.

19. On or about April 15, 1998, Michigan State Police seized $30,011 in cash, money orders, and checks from IMAD HAMMOUD's vehicle in Dearborn, Michigan.

20. On or about June 12, 1998, KARIM NASSER opened Huntington National Bank account number 252171972 with a $10,000 deposit.

21. On or about June 15, 1998, KARIM NASSER made two deposits into his Huntington National Bank account in the amounts of $9,900 and $10,000.

22. On or about June 15, 1998, HASSAN NASSER deposited $19,000 in cash into his Huntington National Bank account number 252171980.

22

23. On or about June 16, 1998, KARIM NASSER deposited $9,900 into his Huntington National Bank account.

24. On or about June 23, 1998, KARIM NASSER deposited $10,000 into his Huntington National Bank account.

25. On or about June 24, 1998, KARIM NASSER deposited $9,900 into his Huntington National Bank account.

26. On or about November 5, 1998, MAJID HAMMOUD incorporated Riverview Smokers Shop, Inc. in Riverview, Michigan.

27. On or about February 16, 1999, MAJID HAMMOUD issued a check in the amount of $8,450 to Rainbow Travel, which was cashed the next day by KARIM NASSER.

28. On or about April 30, 1999, Fadi Haydous incorporated K & H Enterprises, Inc.

29. On or about May 7, 1999, YOUSSEF BAKRI possessed 22 cartons of contraband cigarettes in Livonia, Michigan.

30. On or about May 7, 1999, YOUSSEF BAKRI possessed 130 cartons of contraband cigarettes in Westland, Michigan.

31. On or about May 26, 1999, JIHAD HAMMOUD, using the name "Jay Hammoud," incorporated Ultima Investment Group L.L.C.

32. On or about June 9, 1999, Hassan Makki delivered cigarettes to 7847 Freda in Dearborn, Michigan, where Bassam Hourani was to apply counterfeit cigarette tax stamps to them.

33. On or about June 10, 1999, NAJI ALAWIE possessed 558 cartons of contraband cigarettes in Dearborn, Michigan.

34. On or about July 16, 1999, MAJID HAMMOUD purchased a cashier's check in the amount of $38,380.

35. On or about July 21, 1999, MAJID HAMMOUD wire transferred $5,750 to IMAD HAMMOUD in Beirut, Lebanon.

36. On or about August 12, 1999, Ultima Investment Group issued a check in the amount of $12,000 to the Tobacco Stop, Inc. (incorporated by MAJID HAMMOUD).

37. On or about September 8, 1999, MAJID HAMMOUD deposited a check from Ultima Investment Group in the amount of $10,000 and from The Tobacco Stop, Inc. in the amount of $37,150 into his Michigan National Bank account.

38. On or about September 17, 1999, IMAD HAMMOUD wire transferred $993.22 and $700 from Dearborn, Michigan, to HASSAN SROUR in Montreal, Quebec, Canada.

39. On or about September 22, 1999, MAJID HAMMOUD issued a check in the amount of $41,550 from his Michigan National Bank account and negotiated it.

40. On or about October 12, 1999, IMAD HAMMOUD dispatched KARIM NASSER to deliver about 1,000,000 counterfeit California cigarette tax stamps to Haissam Nashar.

41. On or about November 19, 1999, Ferial Charara quit claimed 26969 Rochelle in Dearborn Heights, Michigan to Fadi Haydous, which Haydous sold the same day for $250,000.

42. On or about November 23, 1999, MAJID HAMMOUD deposited the $62,481 check that Fadi Haydous received from the sale of 26969 Rochelle, Dearborn Heights, Michigan as the proceeds due the seller into his Michigan National Bank account.

43. On or about December 29, 1999, MAJID HAMMOUD issued a check to himself in the amount of $133,332 from his Michigan National Bank account.

44. On or about February 10, 2000, Ultima Investment Group issued a check in the amount of $25,000 to Fadi Haydous stating "I loan."

45. On or about February 10, 2000, KARIM NASSER wire transferred $2,500 to "Jacob Hammoud," which was an alias for IMAD HAMMOUD, in Beirut, Lebanon.

46. On or about February 11, 2000, JIHAD HAMMOUD using the name "Jay Hammoud" became the resident agent for K&H Enterprises, previously incorporated by Fadi Haydous.

47. On or about February 14, 2000, KARIM NASSER wire transferred $2,500 to "Jacob Hammoud," which was an alias for IMAD HAMMOUD, in Beirut, Lebanon.

48. On or about February 26, 2000, JIHAD HAMMOUD wire transferred $1,000 to IMAD HAMMOUD in Beirut, Lebanon.

49. On or about May 12, 2000, KARIM NASSER deposited $7,890 in cash into his Huntington National Bank account.

50. On or about May 16, 2000, KARIM NASSER wire transferred $7,850 to Chong Sung Cho in New York, New York.

51. On or about May 22, 2000, KARIM NASSER deposited $4,400 in cash into his Huntington National Bank account.

52. On or about May 22, 2000, KARIM NASSER wire transferred $4,425 to Bay Bridge Realty in New York, New York.

53. On or about June 7, 2000, IMAD HAMMOUD, using the alias "Diane Ross," wire transferred $2,500 to HASSAN Al- MOSAWI in Lebanon.

54. On or about June 7, 2000, IMAD HAMMOUD, using the alias "Curtis Carr," wire transferred $2,500 to HASSAN Al- MOSAWI in Lebanon.

55. On or about June 7, 2000, IMAD HAMMOUD, using the alias "Bridgette Mayes," wire transferred $2,500 to HASSAN Al- MOSAWI in Lebanon.

56. On or about June 23, 2000, IMAD HAMMOUD made a cash deposit in the amount of $9,500 into his Huntington National Bank account.

57. On or about June 26, 2000, a wire transfer in the amount of $9,500 was made from IMAD HAMMOUD's Huntington National Bank account to HASSAN AL-MOSAWI in Beirut, Lebanon.

58. On or about October 3, 2000, Ultima Investment Group issued a check in the amount of $6,000 to IMAD HAMMOUD with the notation "I loan."

59. On or about October 31, 2000, Fadi Haydous, using the alias "Mohamad Al Ahmad," wire transferred $1,886 to HASSAN AL-MOSAWI in Beirut, Lebanon.

60. On or about October 31, 2000, Fadi Haydous, using the alias "Mohamad Al Ahmad," wire transferred another $1,886 to HASSAN AL-MOSAWI in Beirut, Lebanon.

61. On or about October 31, 2000, Fadi Haydous, using the alias "Mohamad Al Ahmad," wire transferred another $1,886 to HASSAN AL-MOSAWI in Beirut, Lebanon.

62. On or about October 31, 2000, Fadi Haydous, using the alias "Mohamad Al Ahmad," wire transferred another $1,886 to HASSAN AL-MOSAWI in Beirut, Lebanon.

63. On or about November 10, 2000, Ultima Investment Group issued a check in the amount of $50,040 to Hind Hammoud (JIHAD HAMMOUD's wife) with instructions to "wire to Kuwait – Imad."

64. On or about November 14, 2000, JIHAD HAMMOUD, using the name "Jay Hammoud" as president, dissolved K&H Enterprises previously incorporated by Fadi Haydous.

65. In or about November 2000, IMAD HAMMOUD traveled to Cote d'Ivoire (Ivory Coast) for the purpose of obtaining counterfeit cigarette tax stamps.

66. On or about November 19, 2000, Fadi Haydous, using the alias "Ricki Thompson," wire transferred $4,785 to "Jecob Hammoud," an alias for IMAD HAMMOUD, in Abidjan, Cote d'Ivoire (Ivory Coast).

67. On or about December 4, 2000, IMAD HAMMOUD deposited $10,000 into his Huntington National Bank account.

68. On or about December 8, 2000, IMAD HAMMOUD deposited $5,000 into his Huntington National Bank account.

69. On or about December 14, 2000, IMAD HAMMOUD deposited $10,000

into his Huntington National Bank account.

70. On or about December 14, 2000, IMAD HAMMOUD wire transferred $25,000 from his Huntington National Bank account to DYN Corp. in Kuwait.

71. On or about December 28, 2000, IMAD HAMMOUD deposited $9,000 into his Huntington National Bank account, and then wire transferred $9,000 to DYN Corp. in Kuwait.

72. On or about January 4, 2001, JIHAD HAMMOUD wire transferred $15,000 to the DYN Corp. in Kuwait.

73. On or about January 6, 2001, Ultima Investment Group issued a check in the amount of $65,000 with the notation "deposit to cover wire to Africa."

74. On or about January 17, 2001, Ultima Investment Group issued a check in the amount of $50,000 to JIHAD HAMMOUD, which he deposited into his Huntington National Bank account with the notation "I wire."

75. On or about January 17, 2001, JIHAD HAMMOUD wire transferred $50,000 to DYN Corp. in Kuwait.

76. On or about February 21, 2001, IMAD HAMADEH deposited a check from Ultima Investment Group in the amount of $112,500 into his bank account.

77. On or about February 22, 2001, IMAD HAMADEH wire transferred $47,000 through the Bank of New York to Fawzy Ayoub's bank account at Beirut Ryiad Bank

in London, England.

78. On or about March 8, 2001, IMAD HAMMOUD issued a check in the amount of $3,100 which was endorsed and cashed by Fadi Haydous.

79. On or about March 13, 2001, IMAD HAMADEH deposited a check made payable to IMAD HAMMOUD in the amount of $206,775 into HAMADEH's bank account.

80. On or about April 23, 2001, Ultima Investment Group issued a check in the amount of $32,339 to Hayat's Smoker's Choice.

81. On or about May 4, 2001, MAJID HAMMOUD and Susan A. Hammoud quit claimed lot 1981 of Dearborn Manor subdivision to Fadi Haydous for $67,000.

82. On or about May 15, 2001, Fadi Haydous quit claimed lot 1981 of Dearborn Manor subdivision to Khalil and Shiam Hirajli for $145,000.

83. On or about May 24, 2001, MAJID HAMMOUD wrote a check to "Cash" in the amount of $110,362 and endorsed it.

84. On or about July 19, 2001, IMAD HAMMOUD issued a check to MAJID HAMMOUD in the amount of $40,000.

85. On or about July 21, 2001, IMAD HAMMOUD issued a check in the amount of $50,000 to Global Impex for the purchase of counterfeit Zig Zag cigarette papers.

86. On or about July 26, 2001, IMAD HAMMOUD issued a check in the amount

30

of $3,250 to Global Impex for the purchase of counterfeit Zig Zag cigarette papers.

87.  On or about August 26, 2001, IMAD HAMMOUD issued a check in the amount of $50,000 to Ahmed Mackie for the purpose of purchasing counterfeit Zig Zag cigarette papers.

88.  On or about August 28, 2001, IMAD HAMMOUD issued a check in the amount of $30,000 to Ahmed Mackie for the purpose of purchasing counterfeit Zig Zag cigarette papers.

89.  On or about September 3, 2001, ADEL ISAK possessed approximately 10,095 genuine State of Michigan cigarette tax stamps at the Detroit-Windsor Tunnel while attempting to enter Canada.

90.  On or about September 6, 2001, Ultima Investment Group issued a check to IMAD HAMMOUD in the amount of $25,000.

91.  On or about November 26, 2001, IMAD HAMMOUD procured the delivery of 157,000 counterfeit cigarette tax stamps to Fadi Haydous for shipment to HASSAN NASSER in New York.

92.  On or about January 16, 2002, Ultima Investment Group issued a check to JIHAD HAMMOUD in the amount of $10,000 with the notation "I loan."

93.  On or about July 8, 2002, IMAD HAMADEH took possession of 27,648 rolls of toilet paper, 10,560 pairs of socks, and 60 cans of Similac infant formula

purported to be stolen.

94. On or about July 18, 2002, at the direction of IMAD HAMMOUD, IMAD HAMADEH traveled from Dearborn, Michigan, to Atlanta, Georgia, to meet with THEODORE SCHENK for the purpose of acquiring 15,000 tablets of counterfeit Viagra.

95. On or about August 7, 2002, IMAD HAMADEH took possession of 150 cases of Kleenex toilet paper and 900 cans of Similac infant formula purported to be stolen.

96. On or about November 14, 2002, IMAD HAMMOUD directed IMAD HAMADEH to distribute approximately 20 cases of counterfeit Zig Zag cigarette papers.

97. On or about March 3, 2003, IMAD HAMMOUD caused 5,247 tablets of counterfeit Viagra to be transported from China to the Eastern District of Michigan.

98. On or about March 7, 2003, THEODORE SCHENK instructed ABDEL-HAMID SINNO via e-mail to wire transfer funds to his Washington Mutual bank account in Miami, Florida.

99. On or about March 24, 2003, HASSAN AL-MOSAWI, ABDEL-HAMID SINNO and THEODORE SCHENK procured the shipment of approximately 25,000 tablets of counterfeit Viagra from Florida to Michigan.

32

100. On or about April 14, 2003, HASSAN AL-MOSAWI and ABDEL-HAMID SINNO caused approximately 25,000 tablets of counterfeit Viagra to be transported from Florida to Michigan.

101. On or about April 14, 2003, IMAD HAMMOUD caused approximately 5,098 tablets of counterfeit Viagra to be transported from China to the Eastern District of Michigan.

102. On or about April 18, 2003, HASSAN AL-MOSAWI and ABDEL-HAMID SINNO caused approximately 25,000 tablets of counterfeit Viagra transported from Florida to the Eastern District of Michigan.

103. On or about May 6, 2003, IMAD HAMADEH took possession of 1,500 cans of Similac infant formula purported to be stolen.

104. On or about May 16, 2003, IMAD HAMMOUD procured the shipment of approximately 5,000 tablets of counterfeit Viagra from China to the Eastern District of Michigan.

105. On or about August 25, 2003, ABDEL-HAMID SINNO possessed 50,000 tablets of counterfeit Viagra in Montreal, Quebec, Canada.

106. On September 4, 2003, THEODORE SCHENK possessed approximately 700 tablets of counterfeit Viagra in North Miami Beach, Florida.

All in violation of Title 18, United States Code, Section 1962(d).

33

## FORFEITURE ALLEGATIONS

1. The allegations in count one are hereby repeated, realleged, and incorporated by reference herein as though fully set forth at length for the purpose of alleging forfeiture pursuant to the provisions of Title 18, United States Code, Section 1963. Pursuant to Rule 32.2, Fed. R. Crim. P., notice is hereby given to the defendants that the United States will seek forfeiture as part of any sentence in accordance with Title 18, United States Code, Section 1963 in the event of any defendant's conviction under Count One of this Indictment.

2. The defendants, IMAD MOHAMAD-MUSBAH HAMMOUD, a/k/a "Jecob Hammoud," a/k/a "Jacob Hammoud," a/k/a "Haj Imad," a/k/a "Tony," HASSAN ALI AL-MOSAWI, a/k/a "Hassan Al-Moussaoui," a/k/a "Abu Kifah," HASSAN HASSAN NASSER, KARIM HASSAN NASSER, ALI AHMAD HAMMOUD, a/k/a "Abu Hussein," FADI MOHAMAD-MUSBAH HAMMOUD, a/k/a "Fadi Musbah Hammoud," MAJID MOHAMAD HAMMOUD, a/k/a "Mike Hammoud," JIHAD HAMMOUD, a/k/a "Jay Hammoud," KARIM HASSAN ABBAS, YOUSSEF AOUN BAKRI, HASSAN MOHAMAD SROUR, NAJI HASSAN ALAWIE, ALI NAJIB BERJAOUI, MOHAMAD ZEIDAN, ABDEL-HAMID SINNO, a/k/a "Haj Abdullah," THEODORE SCHENK, IMAD MAJED HAMADEH, and ADEL ISAK,

i. have acquired and maintain interests in violation of Title 18, United States Code, Section 1962, which interests are subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 1963(a)(1);

ii. have property constituting and derived from proceeds which they obtained, directly and indirectly, from the aforesaid pattern of racketeering activity in violation of Title 18, United States Code, Section 1962, which property is subject to forfeiture to the United States of America pursuant to Title 18, United States Code, Section 1963(a)(3).

3.    The interests of the defendants subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 1963(a)(1) and (3) include but are not limited to at least twenty million dollars ($20,000,000).

4.    If any of the property described in paragraphs 2 and 3 above, as a result of any act or omission of a defendant:

(1)    cannot be located upon the exercise of due diligence;

(2)    has been transferred or sold to, or disposed with, a third party;

(3)    has been placed beyond the jurisdiction of the court;

(4)    has been substantially diminished in value; or

(5)    has been commingled with other property which cannot be divided without difficulty;

35

the Court shall order the forfeiture of any other property of the defendants up to the value of any property set forth in paragraphs 2 and 3 above.

5.    The above-named defendants, and each of them, are jointly and severally liable for the forfeiture obligations as alleged above.

All pursuant to the Title 18, United States Code, Section 1963.

## COUNT TWO: (Smuggling – 18 U.S.C. § 545)

D-3 HASSAN ALI AL-MOSAWI,
     a/k/a "Hassan Al-Moussaoui,"
     a/k/a "Abu Kifah,"

Between on or about March 27, 2003 and May 22, 2003, within the Eastern District of Michigan, Southern Division, and elsewhere, HASSAN ALI AL-MOSAWI, a/k/a "Hassan Al-Moussaoui," a/k/a "Abu Kifah," defendant herein, knowingly and willfully, with intent to defraud the United States, smuggled and attempted to smuggle into the United States 40 tons of polyethylene resin with a false,

forged and fraudulent certificate of origin misrepresenting the origin of the resin to

be Kuwait; all in violation of Title 18, United States Code, Section 545.

THIS IS A TRUE BILL.

FOREPERSON

Dated: 4/14/04

JEFFREY G. COLLINS
United States Attorney

BARBARA L. MCQUADE
Assistant United States Attorney

ROBERT P. CARES
Assistant Chief, Criminal Division

KENNETH R. CHADWELL
Assistant United States Attorney

| United States District Court Eastern District of Michigan | Criminal Case Cover Sheet | Case Number 03-80406 |
|---|---|---|

**NOTE: It is the responsibility of the Assistant U.S. Attorney signing this form to complete it accurately in all respects.**

| **Companion Case Information** | **Companion Case Number:** 03-80079 |
|---|---|
| This may be a companion case based upon LCrR 57.10 (b)(4)[1]: | **Judge Assigned:** Hon. George Caram Steeh |
| X Yes ☐ No | **AUSA's Initials:** KRC |

**Case Title:** USA v. Imad Mohamad-Musbah Hammoud, et al

**County where offense occurred :** Wayne

**Check One:** X Felony ☐ Misdemeanor ☐ Petty

☐ Indictment____/Information____ **no** prior complaint.
☐ Indictment____/Information____ based upon prior complaint [Case number: ]
☒ Indictment____/Information____ based upon LCrR 57.10 (d) *[Complete Superseding section below]*.

## Superseding Case Information:

**Superseding to Case No:** 03-80406      **Judge:** Gerald E. Rosen

☐ Original case was terminated; no additional charges or defendants.
☐ Corrects errors; no additional charges or defendants.
☐ Involves, for plea purposes, different charges or adds counts.
X Embraces same subject matter but adds the additional defendants or charges below:

**Defendant name**

| Defendant name | Charges |
|---|---|
| D-2 IMAD MOHAMAD-MUSBAH HAMMOUD | 18 U.S.C. §1962(d) |
| D-3 HASSAN ALI AL-MOSAWI | 18 U.S.C. §1962(d) |
| D-4 HASSAN HASSAN NASSER | 18 U.S.C. §1962(d) |
| D-5 KARIM HASSAN NASSER | 18 U.S.C. §1962(d) |
| D-6 ALI AHMAD HAMMOUD | 18 U.S.C. §1962(d) |
| D-7 FADI MOHAMAD-MUSBAH HAMMOUD | 18 U.S.C. §1962(d) |
| D-8 MAJID MOHAMAD HAMMOUD | 18 U.S.C. §1962(d) |
| D-9 JIHAD HAMMOUD | 18 U.S.C. §1962(d) |
| D-10 KARIM HASSAN ABBAS | 18 U.S.C. §1962(d) |
| D-11 YOUSSEF AOUN BAKRI | 18 U.S.C. §1962(d) |
| D-12 HASSAN MOHAMAD SROUR | 18 U.S.C. §1962(d) |
| D-13 NAJI HASSAN ALAWIE | 18 U.S.C. §1962(d) |
| D-14 ALI NAJIB BERJAOUI | 18 U.S.C. §1962(d) |
| D-15 MOHAMAD ZEIDAN | 18 U.S.C. §1962(d) |

**16  ABDEL-HAMID SINNO**                    18 U.S.C. §1962(d)
**D-17  THEODORE SCHENK**                     18 U.S.C. §1962(d)
**D-18  IMAD MAJED HAMADEH**                  18 U.S.C. §1962(d)
**D-19  ADEL ISAK**                           18 U.S.C. §1962(d)

_____

April 14, 2004
Date

KENNETH R. CHADWELL
Assistant United States Attorney

(313) 226-9698
Phone Number

[1] Companion cases are matters in which it appears that (1) substantially similar evidence will be offered at trial, (2) the same or related parties are present, and the cases arise out of the same transaction or occurrence. Cases may be companion cases even though one of them may have already been terminated.

5/1/99